IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

*Newport News Division*

FILED
IN OPEN COURT

SEP 3 0 2024

CLERK, U.S. DISTRICT COURT
NORFOLK, VA

UNITED STATES OF AMERICA,

v.

JOHNNY RAY RIDDICK, JR.,
a/k/a "Glo,"

Defendant.

Criminal No. 4:23-cr-94-3

## STATEMENT OF FACTS

The United States and the defendant, Johnny Ray Riddick, Jr. (a/k/a "Glo") (hereinafter "Riddick" or "the defendant"), agree that, if this matter had proceeded to trial, the United States would have proven the following facts beyond a reasonable doubt with admissible and credible evidence:

1. Beginning on a date unknown to the grand jury, but at least on or about July 6, 2023, in the Eastern District of Virginia and elsewhere, the defendant, Riddick, and co-defendant Andre Ephraim Billups, Jr., (a/k/a "Dre"), aided, abetted, counseled, commanded, induced, and procured by each other and others known and unknown to the Grand Jury, did:

   a. knowingly and willfully combine, conspire, confederate, and agree with each other, unlawfully to obstruct, delay, and affect, and attempt to obstruct, delay, and affect, commerce, and the movement of articles and commodities in commerce, by robbery, as those terms are defined in 18 U.S.C. § 1951, by the unlawful taking and obtaining of business property from the person and in presence of a victim employee of the victim business, the United States Postal Service ("USPS" or "Postal Service"); and

    b.  knowingly use and carry a firearm during and in relation to, and possess a firearm in furtherance of, a crime of violence for which they may be prosecuted in a court of the United States, specifically the crimes of Interference with Interstate and Foreign Commerce by Robbery, in violation of 18 U.S.C. §§ 1951(a) and (2), and Assault of a Federal Employee with a Dangerous Weapon, in violation of 18 U.S.C. §§ 111(b) and (2), as set forth respectively in Counts Five and Six of the Superseding Indictment.

  2.  Co-defendant Alexis Sierra West (a/k/a "Lex"), knowing that such offense had been committed against the United States by Billups and Riddick, thereafter intentionally received, relieved, comforted, or assisted Billups and Riddick in order to hinder and prevent that person's apprehension, trial, or punishment for their crimes, to wit: violations of 18 U.S.C. §§ 1704 and 2 (Unlawful Possession of Postal Keys); §§ 1708 and 2 (Theft & Attempted Theft of U.S. Mail); §§ 1951(a) and 2 (Conspiracy to Interfere with Commerce by Robbery and Interference with Commerce by Robbery); §§ 111(b) and 2 (Assault of a Federal Employee with a Dangerous Weapon); and §§ 924(c) and 2 (Use, Carry, and Brandish a Firearm During and in Relation to, and Possess a Firearm in Furtherance of, a Crime of Violence); all as charged in Counts One through Seven of the Superseding Indictment, respectively.

  3.  At all times relevant to the Indictment and Superseding Indictment in this case, the victim business, the USPS, was an independent federal agency headquartered in Washington, D.C., with a universal service obligation to provide postal service in all areas and communities of the United States. The USPS has the largest retail network in the United States and is the largest postal service in the world.

  4.  As the USPS has continued to harden its blue collection box inventory across the country against traditional fishing-related mail theft over the past few years, there has been a



corresponding rise in the theft of "arrow keys," the master keys used to access the variety of mail repositories, including blue collection boxes, outdoor parcel lockers, and apartment mailbox panels. Such keys are worth thousands of dollars on the black market, as criminals like the co-defendants Billups, Riddick, West, and Gary use them to steal mail in the furtherance of other lucrative criminal schemes, like check fraud and identity theft.

5. The U.S. Mail is a vital part of interstate and foreign commerce, as individuals and businesses use it, for example, to send currency or equivalents; to send contracts or receipts; and to ship and send items purchased in interstate commerce. In addition, these arrow key thefts both actually result in, and always carry with them the natural and ordinary consequence of, obstructing, delaying, or affecting interstate and foreign commerce, with effects ranging from delays due to the carriers being interrupted to major disruptions stemming from lost or stolen mail or the abuse of a mail theft victim's identity or financial accounts. That actual disruption and threat thereof was true of all arrow key thefts at all times relevant to the Amended Indictment and Criminal Information.

6. A given arrow key is limited by specified geographic restrictions, and the keys are distributed through authorized USPS channels only to authorized personnel (e.g. mail carriers) and used in the performance of official duties as generally defined within the meaning of 39 U.S.C. § 403. Due to the wide-ranging access and related value of the keys, their possession, use, and transfer is highly regulated. Thus criminals seek access to them through illicit means, whether by stealing them directly from postal workers through actual or threatened violence, by enlisting postal employee co-conspirators in schemes whereby the criminals unlawfully "lease" the arrow keys, or by purchasing the keys in criminal marketplaces like the Dark Web.

### *The July 6 Robbery*

7. On or about July 6, 2023, Billups and Riddick robbed a USPS carrier in the area of Jefferson Point in Newport News, in the Eastern District of Virginia, with Billups acting as the gunman and Riddick serving as the getaway driver. Billups and Riddick were very familiar with that area, as Billups's best friend and Riddick's romantic partner, West, lived in that apartment complex with her roommate H.D. and allowed her apartment to be used as a gathering place for their group of friends from Gloucester. Before they actually committed the robbery, Riddick and Billups discussed their need for arrow keys and different ways to obtain them.

8. On July 6, 2023, shortly before the robbery, Billups contacted West and asked her to wake Riddick, who was staying with her. Billups spoke with Riddick, and Riddick dressed quickly and left the apartment.

9. Both Riddick and Billups habitually carried firearms on or about their persons and frequently discussed firearms. During that robbery, Billups was armed with a firearm. He first tried to grab the arrow key from the carrier, but when she resisted, indicated to her that he was armed in order to coerce her into producing and turning over her arrow key. After Billups obtained the arrow key from the carrier, he fled on foot towards the location where his co-conspirator Riddick was waiting for him.

10. Billups was being chased by a maintenance man for the apartment complex, so he ran into the girls' apartment – despite its appearing to have a closed patio door – rather than escaping directly around the building just to his side. When he arrived at the apartment, he knocked on the patio door with the gun and was allowed to enter. Billups left the key in the apartment, and West contacted Riddick to ask what to do with it. He directed her to hide it, which she did within



her closet in her bedroom. Later, West lied extensively to law enforcement about her knowledge of the robber and robbery.

11. During his flight, Billups was heard communicating with Riddick via his smartphone, during which conversation Riddick chastised him for running through the girls' apartment. Thereafter, Billups exited the apartment and ran to where Riddick was waiting in Riddick's car, which had a loud and distinctive exhaust. Riddick's car had been present in the complex before the robbery but was no longer there after the robbery.

12. West and H.D. later met up with Riddick to turn over the key and a backpack Billups had left. At that meeting – where Billups was waiting nearby in Riddick's vehicle – Riddick reset the girls' cellphones to wipe them because he was worried about a potential law enforcement investigation. Billups separately wiped his own cellphone.

### *The December 4 Hidenwood Collection Box Break-In*

13. Rather than immediately sell the key, Billups and Riddick, aided and abetted by others, including co-defendant Gary, repeatedly used it to break into USPS collection boxes in the area to steal U.S. mail, all in furtherance of their conspiracy to defraud banks and credit unions.

14. At no time relevant to the indictment did Billups, Riddick, or West have lawful authority or permission to possess or use any key suited to any lock adopted by the USPS and in use on any of the mails or bags thereof, such as the Jefferson Point arrow key.

15. Due to numerous customer complaints of mail theft from blue collection boxes in the Tidewater area after the armed robberies of letter carriers in Hampton and Newport News in 2023, the USPIS began surveilling various blue collection boxes in the area, including targeted surveillance operations beginning on or about the evening of December 3, 2023, at collection boxes that were particularly hard hit by such break-ins.




16.  Specifically, on or about December 3, 2023, law enforcement officers including United States Postal Inspection Service (USPIS) Postal Inspectors, the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) special agents and task force officers, and Newport News Police Department officers conducted a surveillance operation at the Hidenwood Post Office on Hiden Boulevard in Newport News, Virginia. As part of that operation, a camera was positioned to observe the blue collection boxes associated with that Post Office.

17.  Late on the 3rd and into the early hours of the 4th, Billups drove a white Chevrolet Cruze registered to his romantic partner H.B. (the "Cruze") and picked up Gary in Gloucester. Thereafter, Gary agreed to drive the Cruze, despite knowing that Billups intended to use the stolen Jefferson Point arrow key to break into an authorized depository of mail matter (the Hidenwood collection box and other collection boxes) again and to steal mail therefrom.

18.  Gary also became aware that Billups was armed with a handgun and an AK-style rifle, specifically a Century Arms VSKA 7.62 rifle bearing serial number SV7063210 that Billups had bought the week after his nineteenth birthday. Nevertheless, Gary drove them to the Hidenwood Post Office, where Billups exited the vehicle and used the stolen Jefferson Point arrow key to open the box. As he was going through it, a USPIS Inspector exited her vehicle, approached the suspect vehicle, and attempted stop it via verbal commands. Billups got back into the suspect vehicle and Gary drove quickly towards the Inspector in front of the suspect vehicle. The Postal Inspector discharged her service weapon, striking the windshield of the suspect vehicle and Billups's shoulder.

19.  Other law enforcement officers stationed nearby heard the discharging and radio traffic and pursed the vehicle. The vehicle fled from law enforcement from Newport News to York County and then to Gloucester County, reaching speeds approaching at least 100 miles per hour

according to members of the law enforcement team involved in following the vehicle. Thereafter, Gloucester County law enforcement deployed "stop sticks," a device to disable a vehicle. After the vehicle was disabled, Gary was taken into custody immediately. Billups fled into a nearby wooded area but eventually surrendered after disposing of his handgun.

20. Immediately after Gary and Billups's December 4 flight, West responded to the crash scene in Gloucester, where Riddick was again overheard via phone expressing frustration with Billups for not following their plan, in this case, waiting until Riddick had returned from Puerto Rico (where he was held up due to weather), so that they could have broken into the boxes together.

21. The Cruze was lawfully searched pursuant to a valid federal warrant, and agents recovered:

    a. the arrow key stolen July 6, 2023;

    b. Gary's and Billups's smartphones, later searched pursuant to valid federal warrants;

    c. an AK-47-style rifle, specifically a Century Arms VSKA 7.62 rifle bearing serial number SV7063210, black with a tan magazine, loaded with thirty rounds of ammunition, including one in the chamber, and with smudges of what appeared to be blood on it;

    d. additional firearm-related items, including (from the trunk) an additional (black) magazine, a box of CCI standard velocity .22 long rifle ammunition, an additional loose round of ammunition, and a cloth holster; and (from the center console) an additional (tan) magazine loaded with 16 rounds of ammunition;

    e. a driver's license and debit/bank cards in the names of several different individuals, including an NFCU debit card in the name D.F.;

    f.  multiple checks in the names of different individuals, including a Wells Fargo check bearing the name [M.D.] made payable to Hampton Blvd, LLC in the amount of $500 that had been stolen from the mail, as M.D. had issued the check to pay his rent and had deposited it in the blue collection box at the Hidenwood Post Office on or about October 25, 2023, later learning that his apartment management company never received the check, causing him to have to re-issue a new check to the company; and

    g.  a USPS parcel bearing the tracking number ending -2482. also stolen from the mail, originally destined for [T.Y.] at [****] Stoneham Circle, Loveland, Colorado, 80535 with a return address of [L.D.] [**] on Ringo Drive in Newport News, which L.D. placed in the blue collection box at the Hidenwood Post Office on or about December 2, 2023, and was part of her business selling handwritten holiday cards on eBay.

### *The Fraud Scheme*

  22.  As noted, a goal of the arrow key theft was to use the key to steal mail to use in and further the conspiracy of Riddick, Billups, and West to defraud banks and credit unions, such as Navy Federal Credit Union (NFCU) and Wells Fargo, by means of materially false and fraudulent pretenses, representations, and promises in violation of 18 U.S.C. §§ 1344 and 1349.

  23.  Billups, Riddick, and other co-conspirators and associates frequently advertised on social media to locate and elicit third-party account holders willing to participate in their bank fraud scheme. While Billups took the primary role in committing the robbery, Riddick was similarly critical with respect to ~~been~~ engaging in just such lucrative bank and wire fraud schemes known as "card cracking," "check washing," or "smacking the account." Those methods involve depositing a counterfeit, whether altered or entirely fabricated, check into a third-party account,




then trying to withdraw or spend down as much of that money as possible before the fraudulent check is detected and the account frozen or transaction reversed.

24. The third-party account is either one fraudulently established using the means of identification of an identity theft victim – including from sensitive personally identifiable information gleaned from stolen mail – or is of an individual who willingly joins the conspiracy, usually in exchange for a portion of the ill-gotten proceeds.

25. Moreover, a mutual friend of the co-defendants had a relative who was employed by the USPS, and Riddick would frequently pressure her to attempt to get an arrow key illicitly.

26. Riddick likewise attempted to get associates to let him use their paychecks for "drops," in exchange for which he said he would offer hundreds of dollars in compensation.

27. Billups, Riddick, and West worked together in connection with the bank fraud scheme. As part of that scheme, Billups and Riddick would steal mail using the purloined arrow key. Riddick sent West pictures of checks from the mail, which she digitally "washed" using an application on her phone. She then sent the checks back to Riddick, who used them to produce counterfeit checks.

28. In addition to the activity conducted digitally, Billups and Riddick had supplies like stacks of blank checks and a printer, which they operated in West's room in Jefferson Point.

29. One example of the fraud related to the items in the names of M.D. and D.F. recovered from the Cruze. Specifically, on or about November 2, 2023, at a Denbigh ATM, NFCU surveillance video showed Billups depositing a Wells Fargo check bearing the name [M.D.] in the amount of $4,690.00 made payable to [D.F.], who had given control of his bank card to Billups. That check was later revealed to be not the original, legitimate check with an altered payee and amount but rather a counterfeit check.



30. Numerous banks and credit unions – that is, financial institutions as defined by 18 U.S.C. § 20 because they are insured depository institutions as defined in section 3(c)(2) of the Federal Deposit Insurance Act – were involved in the scheme, including NFCU and Wells Fargo.

31. During the overall investigation into this conspiracy and the underlying crimes, law enforcement validly sought and lawfully received both consent and numerous warrants to search devices, premises, persons, electronic accounts, etc., all of which were executed lawfully.

32. This statement of facts includes those facts necessary to support the Plea Agreement between the defendant and the United States. It does not include each and every fact known to the defendant or to the United States, and it is not intended to be a full enumeration of all of the facts surrounding the defendant's case.

33. The actions of the defendant, as recounted above, were in all respects knowing and deliberate, and were not committed by mistake, accident, or other innocent reason.

Jessica D. Aber
United States Attorney

Date: 27 Sept 2024

By: _____
Julie D. Podlesni
Assistant U.S. Attorney

<u>Defendant's Signature</u>: After consulting with my attorney and pursuant to the Plea Agreement entered into this day between the defendant, Johnny Ray Riddick, Jr., and the United States, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

Date: 9-30-2024

_____
Johnny Ray Riddick, Jr.
Defendant

<u>Defense Counsel's Signature</u>: I am counsel for the defendant, Johnny Ray Riddick, Jr., in this case. I have carefully reviewed the above Statement of Facts with the defendant. To my knowledge, the defendant's decision to stipulate to these facts is an informed and voluntary one.

Date: 9/30/24

_____
Roger Whitus, Esq.
Counsel for the Defendant